UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**FILE COPY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | Criminal No. **18CR279** |
| v. | § § | |
| **DAYKAR MOPARTY** | § § § § § § § | |
| Defendant | § | |

United States Courts
Southern District of Texas
FILED

MAY 22 2018

David J. Bradley, Clerk of Court

INDICTMENT

THE GRAND JURY CHARGES:

General Allegations

At all times material to this Information, unless otherwise specified:

## Relevant Entities and Individuals

1. Dayakar Moparty ("**MOPARTY**") was the owner of Softspeed International ("SOFTSPEED"), a Texas corporation and the co-owner of Red Oak Hospital and Doctors Diagnostic Hospital, private hospitals located in Houston, Texas.

2. Co-conspirator Northwest Houston Cardiology, Inc. ("NORTHWEST"), was a Texas incorporated medical clinic located at 21212 Northwest Freeway, Suite 415, Houston, Texas and at Hargrave, Suite 100, Houston, Texas. NORTHWEST was owned and operated by three physicians: Aditya Samal, Tulsidas Kuruvanka, and Krishnamoorthy Vivekananthan.

3. Aditya Samal ("SAMAL") is a medical doctor licensed to practice in Houston, Texas as a cardiologist at NORTHWEST.

4. Tulsidas Kuruvanka ("KURUVANKA") is a medical doctor licensed to practice in Houston, Texas as a cardiologist at NORTHWEST.

5. Krishnamoorthy Vivekananthan ("VIVEK") is a medical doctor licensed to practice in Houston, Texas as a cardiologist at NORTHWEST.

## HEALTH CARE BENEFIT PROGRAMS

6. Blue Cross Blue Shield of Texas (BCBS), Aetna Health, Inc., ("Aetna"), and Cigna Corporation ("Cigna"), (collectively, the "health care benefit programs") are private plans and contracts, affecting commerce, under which medical benefits, items and tests are provided to individuals.

7. Individuals who receive benefits from the health care benefit programs are referred to as "beneficiaries".

8. Health care providers that provide tests to beneficiaries are able to apply for and obtain "provider numbers" from the health care benefit programs. A health care provider who is issued a provider number is able to file claims with the health care benefit programs to obtain reimbursement for goods or tests provided to beneficiaries.

9. Payments under the health care benefit programs are often made directly to a provider of goods or tests, rather than to a beneficiary. This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits the claim to the health care benefit program for payment, either directly or through a billing company.

10. To obtain payment from insurance carriers like BCBS, Cigna, or Aetna the provider or the provider's designee was required to submit claims to the insurance carrier that

included, among other things, the following information (1) the provider's unique provider identification number, (2) the patient's name (3) the patient's diagnosis prescribed by a standardized code, (4) a description of tests rendered to the patient using standardized codes, (5) the date and location the tests were provided, and (6) the amount claimed for the payment.

11. BCBS, Aetna, and Cigna, and other health care benefit programs relied on NORTHWEST and **MOPARTY** to submit true and accurate claims.

## COUNT 1

### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. §1349)

12. Paragraphs 1 through 11 of the General Allegations section of this Indictment are re-alleged and incorporated as though fully set forth herein.

13. From in or around May 2011 and continuing through in or around July 2013, in the Houston Division of the Southern District of Texas, and elsewhere, the defendant

**DAYKAR MOPARTY**

did knowingly and willfully combine, conspire, confederate and agree with other persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1349, that is, to execute a scheme and artifice to defraud a health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24 (b) namely, BCBS, Cigna, Aetna and other health care programs to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and tests.

3

## Objects of the Conspiracy

14. It was the object of the conspiracy for the co-conspirators, including **MOPARTY** to unlawfully enrich themselves and/or others known and unknown by submitting and/or causing to be submitted false and fraudulent claims for medical tests at an entity where claims could be billed at a higher re-imbursement rate and to willfully cause the disclosure of individually identifiable health information to another entity with intent to sell, transfer or use such information for private profit.

## Manner and Means of Conspiracy

The manner and means by which **MOPARTY** sought to accomplish the object and purpose of the conspiracy included, among others, the following:

15. SAMAL, VIVEK AND KURUVANKA, were medical doctors and partners in a medical practice at NORTHWEST, located at 21212 Northwest Freeway, Suite 415, Houston, Texas as well as 13325 Hargrave, Suite 100, Houston, Texas. All three doctors had signature authority on NORTHWEST's Compass Bank account number xxxxx7437.

16. **MOPARTY** operated a business named SOFTSPEED INTERNATIONAL ("SOFTSPEED"), located at 6225 FM 9290, Suite 100, Spring, Texas.

17. **MOPARTY** co-owned and operated Red Oak Hospital located at 17400 Red Oak Houston, Texas. MOPARTY had signature authority on Red Oak's Regions Bank account xxxxx6380.

18. **MOPARTY** co-owned and operated Cleveland Imaging and Surgical Hospital, d.b.a Doctor's Diagnostic Hospital ("Doctor's Diagnostic"), a Texas corporation located at

4

1017 South Travis Street, Cleveland, Texas. **MOPARTY** had signature authority on the Doctors Diagnostic Chase Bank account xxxxxx0945.

19. **MOPARTY** co-owned and operated a management services company named SPRING KLEIN SURGICAL HOSPITAL ("SPRING KLEIN"). **MOPARTY** had signature authority on Spring Klein's Green Bank account number xxxxx5506.

20. In or around June 2011, on behalf of NORTHWEST, SAMAL signed an independent contractor agreement with **MOPARTY**. The agreement allowed **MOPARTY** through SOFTSPEED to bill for tests performed at NORTHWEST at a much higher re-imbursement rate.

21. From in or around May 2011 through in or around July 2013, NORTHWEST routinely performed various diagnostic tests and provided billing information to **MOPARTY** only for patients who qualified for out-of network benefits.  The patient information provided to **MOPARTY** by NORTHWEST was without the consent and knowledge of the patient and then billed by Red Oak Hospital or Doctor's Diagnostic Hospital. Various health care benefit programs including BCBS paid for medical tests performed by NORTHWEST as if they were performed at Red Oak Hospital or Doctors Diagnostic, resulting in a higher re-imbursement rate.

22. After health care benefit programs deposited payments into Red Oak's bank account, **MOPARTY** would and did transfer the proceeds of the fraud to Spring Klein's bank account.

23. **MOPARTY** also received approximately $17 million dollars in transfers from Doctors Diagnostic into his personal Chase bank account number xxxxx2057.

24. **MOPARTY** transferred approximately $17 million dollars from his personal Chase Bank account xxxxxx2057 to his SPRING KLEIN Green Bank account number xxxxx5506.

25. From in or around June 2011 through in or around November 2013, **MOPARTY** through SPRING KLEIN paid NORTHWEST approximately $2.5 million dollars for fraudulent claims billed and paid through Red Oak Hospital or Doctor Diagnostic.

26. From in or around June 2011 through in or around November 2013, **MOPARTY** fraudulently billed health care benefit programs such as BCBS and other programs for an amount in excess of $10 million dollars for medical tests that were allegedly provided by Red Oak or Doctors Diagnostic but were in fact provided by NORTHWEST.

27. After the various health care benefit programs deposited payments into the accounts of Red Oak Hospital or Doctor Diagnostics Hospital, **MOPARTY** would and did transfer the proceeds of the fraud from these entities to Spring Klein's Green Bank account xxxxx5506.

Overt Acts

1. In furtherance of the conspiracy, and to effect the objects thereof, the defendant aided and abetted by others unknown, performed and caused to be performed, among others, the overt acts set forth herein, in the Southern District of Texas, and elsewhere,

    a. In or around June 9, 2011, NORTHWEST allegedly entered into an independent contractor agreement where **MOPARTY** through SOFTSPEED would provide certain "equipment leasing, scheduling, collections and billing services". The agreement was signed by **MOPARTY** and SAMAL.

    b. In or around June 2013, NORTHWEST allegedly performed medical tests on patient M.B. at NORTHWEST and Red Oak was paid approximately $16,987 by

BCBS. M.B. had never been to Red Oak and if services had been billed at NORTHWEST instead of Red Oak, the paid amount would have been approximately $763 dollars.

c. In or around June 2013, NORTHWEST allegedly performed medical tests on patient R.C. at NORTHWEST and Red Oak was paid approximately $7,672 by BCBS. R.C. had never been to Red Oak and if services had been billed at NORTHWEST instead of Red Oak, the paid amount would have been approximately $361 dollars.

d. In or around May 2013, NORTHWEST allegedly performed medical tests on patient P.R. at NORTHWEST and Red Oak was paid approximately $9,343 by BCBS. P.R. had never been to Red Oak and if services had been billed at NORTHWEST instead of Red Oak, the paid amount would have been approximately zero dollars.

e. In or around May 2013, NORTHWEST allegedly performed medical tests on patient L.R. at NORTHWEST and Red Oak was paid approximately $8,493 by BCBS. L.R. had never been to Red Oak and if services had been billed at NORTHWEST instead of Red Oak, the paid amount would have been approximately $763 dollars.

f. In or around June 2013, NORTHWEST allegedly performed medical tests on patient P.K. at NORTHWEST and Red Oak was paid approximately $8,493 by BCBS. P.K. had never been to Red Oak and if services had been billed at NORTHWEST instead of Red Oak, the paid amount would have been approximately $763 dollars.

g. From in or around March 2011 through October 2014, **MOPARTY** transferred money from both Doctors Diagnostic Hospital and Red Oak into the account of Spring Klein Hospital. These transfers included proceeds of the fraud scheme. Approximately $29.87 million dollars was transferred from Red Oak to Spring Klein through 97 checks. **MOPARTY** also transferred approximately 17 million dollars that he received from Doctors Diagnostic Hospital into the Spring Klein Bank account. The $2.58 million dollar fraud proceeds paid by health care benefit programs to **MOPARTY** were included in these transfers.

h. In or around June 4, 2013, **MOPARTY** through SPRING KLEIN issued check numbered 2744 for $22,000 deposited into NORTHWEST's Compass Bank account number xxxxx7437 for medical tests performed at NORTHWEST that were billed by Red Oak or Doctor's Diagnostic for a higher re-imbursement rate.

i. In or around June 14, 2013, **MOPARTY** through SPRING KLEIN issued check numbered 2747 for $16,000 deposited into NORTHWEST's Compass Bank account number xxxxx7437 for medical tests performed at NORTHWEST that were billed by Red Oak or Doctor's Diagnostic for a higher re-imbursement rate.

All in violation of Title 18, United States Code, Section 1349.

## NOTICE OF FORFEITURE
## 18 U.S.C. § 982(a)(7)

The United States gives notice to defendants charged in Count One

**DAYKAR MOPARTY**

that upon conviction of conspiracy in violation of Title 18, United States Code, Sections 1349 all property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to such offenses, is subject to forfeiture.

### Property subject to forfeiture

The property subject to forfeiture, includes, but is not limited to, the following property:

At least $10 million in United States dollars.

### Money Judgment

A money judgment may be imposed against the defendant for the total value of the property subject to forfeiture, for which the defendant may be jointly and severally liable.

### Substitute Assets

In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture.


RYAN K. PATRICK
UNITED STATES ATTORNEY

TINA ANSARI
ASSISTANT UNITED STATES ATTORNEY

Original Signature on File

X Foreman of Grand Jury